Norma Owens v. Automotive Machinist Pension Trust Norma Owens v. Automotive Machinist Pension Trust Bruce McKenzie Bruce McKenzie v. Automotive Machinist Pension A quadro has to involve a distribution or division of a marital property. And that is the terminology that we think needs to be interpreted consistently with the other provisions of the Retirement Equity Act. The Retirement Equity Act is very specific in terms of these survivor annuities that they can only be provided to a, quote, spouse. And it also looks at whether the spouse was married. So to expand, so we view the term marital property as a concept that needs to be consistent with those other provisions of the same statute. But wasn't his salary considered marital property? I'm sorry, dowry? Wasn't his salary considered as marital property? We don't believe so, Your Honor. We believe the term marital has to be, first of all, interpreted consistently with the common understanding of that term. And if there is room for a more expansive interpretation, we think you next look at the statutory context to determine what is meant by marital property. The effect of the trial court's ruling, basically, is to import state law concepts of ownership into what we think is a carefully designed and articulated statute, which was intended to create a very limited exception  And if the term marital property, the definition of that term depends on various state law concepts of what is a property right, then we're faced with the prospect that that term may have different interpretations in different states, and one of the purposes of ERISA was to try to provide for uniform application of these rules. And what we are trying to avoid in this situation is a situation where, in effect, state law concepts that would trump the statutory scheme in effect get imported through the back door by someone's definition of what is meant by marital property. But the very concept of property is a state law concept. There's no real federal definition of property. No, but there is a federal interest, Your Honor, in protecting and defining the conditions under which somebody's pension benefit can be assigned to another party. Sure, but that's going to differ from state to state. I mean, you're dealing with a state court order. Some states may use community property to measure. Others may use some common law division. It's going to vary from state to state, but you can live with that. We can live with that as long as we're clear, and it's important, I think, to understand, and this Court has held in the Tice case cited in our brief, that the plans, when they receive a state court order, have an independent obligation to determine whether that state court order meets the ERISA requirements to be a quadro. Not all state court orders do, and that's the statutory scheme. There are listed criteria that have to be met, one of which, again, is the requirement that there has to be a division of marital property, not just any allocation of property even pursuant to a domestic relations law of a state, but statute does use the term marriage. Common law marriage, we would agree, is a marriage for that purpose. But by definition, in Washington, a quasi-marital relationship is something other than a marriage. And in terms of our ability to... How many states have common law marriages? There is, I believe it's in the Boggs decision in the U.S. Supreme Court, there is kind of a, I would say it's probably an equal division, but there's a list of states that have common law marriages in the Boggs case because that actually dealt with the application of ERISA to... What state was that, Boggs? I believe the case originated in Louisiana. Yeah, well, Louisiana is not a common law state. They follow the... I'm sorry, I may have mistoken. I think we're talking about community property states versus common law states. Fair man. Yes, well, I know that Louisiana law is a little different than the law in other places, but I think the Boggs case actually dealt with the application of community property concepts, I'm sorry, rather than common law marriages. But I think it's also important in terms of the statutory scheme to recognize that a state, at least in terms of our literal interpretation of the statute, the state court could not have required our plan to provide a joint and survivor form of benefit to Ms. Owens, nor could it have required the plan to provide her with a pre-retirement survivor annuity if he had died prior to retirement, because those annuities are reserved for spouses, and spouses in the context are people who have been married. Now, if the trial court's order is allowed to stand, then that opens up the possibility of people going to state court saying, well, we have a relationship which is like a marital relationship, therefore I, the partner, should be entitled to a pre-retirement survivor annuity. If that argument gets presented to the plan, the plan has to look somewhere for guidance in terms of how to respond to that. And if we can't look at the statutory scheme, that's going to greatly complicate the administration of the plans, and you'll have to work a little harder. Well, and the Hamilton case, Your Honor, is an example of what can happen in that circumstance. Here she had a quadro, a qualified domestic relations order. Well, it was titled a quadro, but, Your Honor, I think it's very important to understand what happened in the superior court. That order resides by its terms that it was the result of a stipulation to enforce an arbitration award. And we've included in the excerpts of record Mr. Ohn's brief to the superior court. There was no mention of ERISA or the ERISA criteria at all. So even though that order calls itself a qualified domestic relations order, there was no consideration of the statutory requirements. And it cannot be the case that any order that identifies itself as a quadro has to be accepted by the trust. Otherwise, there would not be a statutory obligation on the part of the plan to determine whether the state court order is, in fact, a quadro. Well, I think even if we disagree on this case, I don't think it affects the provisions that are limited to spouse. I mean, that's pretty specific. Well, we hope so, Your Honor. But we thought- I get your point. If I may, just in terms, I'd like to reserve a couple of minutes for rebuttal, if I may. But I mentioned the statutory obligation on the part of the plan to make an independent determination. And that's set forth in Section 206d3 of ERISA. And in the amicus brief, there is an argument that the plans or the trust review of the order in this case was deficient because it did not comply with the Department of Labor regulations governing claims processing. And in the preamble to those regulations, the Department of Labor makes clear that the 206d3 process is separate and apart from the claims regulation process and is not subject to those regulations. And the citation for that statement in the preamble is Volume 65 of the Federal Register, page 70255 at footnote 39. And so we think that, again, the obligation that the plan has to basically make its own independent determination reinforces the notion that the provisions of the Retirement Equity Act, including the quadro provisions, need to be applied literally and stand on their own and cannot be used to import basically state law, domestic relations concepts into the administration of these plans. Well, but that's done when you're dealing with community property or separate property or common law estates or the state of Louisiana. You make that determination, don't you? I mean, look, had she been – if there had been, you know, a marriage as you describe it, you wouldn't have any problem recognizing her interest in that stream of income that he was entitled to. Is that right? If there had been a marriage, that is correct, Your Honor, but we need some objective or bright-line distinction between a cognizable claim under ERISA and some other claim arising under some other aspect of domestic relations law. But isn't it state law that makes – that handles that area? Well, and that's the argument that's being made here, is that somehow ERISA didn't really displace the traditional state regulation of domestic relations. We think that the history of the Retirement Equity Act and its plain terms make clear, and there's case law that supports this, the Boggs case, for example, that in this area, in the area of protecting somebody's pension benefit, the ERISA trumps any conflicting state laws. And in the Boggs decision, the Supreme Court said to the extent that state law conflicts with ERISA, that is the end of the inquiry. ERISA trumps any contrary state law notions. And again, it goes back to the concept that quadros represent a very narrow, limited exemption from the anti-assignment provisions of ERISA, and that's one of the principal features of ERISA. And it's also a requirement for the plans to maintain their tax-exempt status. If there's a violation of the anti-assignment provision, technically the trust could be disqualified, which would be disastrous. I don't really understand. What are you saying? How would it be a disaster? Well, if the plan is disqualified, well, the first thing that happens is the employers who contribute to the plan lose the deductibility of those contributions. Then the plan owes federal income tax on its investment earnings. So this is a very big hammer that the IRS has in terms of the qualified status. And we spend a lot of time, those of us who practice in the area, maintaining, making sure the plans don't lose their qualified status, because if that ever happened, the employers would want out. And you also make sure that the trustees maintain all the power, right? That's part of your job, isn't it? Yes, it is, Your Honor. But that is a limited power, and it is subject to oversight by the IRS and the Department of Labor. It's also subject to competing claims by other claimants, which is what happened in the Hamilton case. And to the extent that we broaden the universe of folks that can make claims against these plans, we're really inviting a lot of litigation similar to the Hamilton situation. And there's less money there that the company can put its hand on and use for other purposes. Well, in this particular case, Your Honor, this is a joint labor management trust. The funding comes from collectively bargained contributions, which the employees view as part of their wage package. So it's not a situation where if we end up paying the wrong person, some company is going to replace that money. Basically, it comes out of the trust assets, which, again, is negotiated as a part of the employee's wage package. So questions? But in the situation where you have people who have gone through a marriage ceremony, then you don't have any. What is the normal process? Say the husband is the one who's working and the wife's at home. Then there's a determination made as to the present value of her half of that stream of income. That is correct, Your Honor. That's the way the joint and survivor annuity typically works. So, for example, and technically the required option is something called a 50% joint and survivor annuity, which is actuarially equivalent to a single life annuity for a person's lifetime. So, as an example, and it's an actuarial calculation based on the relative ages of the participant and spouse, but just as a rough example, if I had a benefit of $1,000 a month for my lifetime as a single person. Take this case here as a rough example. Okay. I'm just curious. Well, I think there's actually an example in the excerpts of a record in the application, which is. What would be the present value of her interest in that? Very rough terms. A 50% survivor annuity would equate, again, if there's kind of a normal age spread, roughly a 20% reduction in the benefit payable for the participant's lifetime to provide the 50% survivor annuity. And, again, it depends on the relative ages. Use a 20%? Well, this is just from my past experience. I think there is actually an example of the. You're talking about this count? Well, actually, if you look at the application that was completed in this case, it starts at page 104 of the excerpts of the record, but it doesn't have numbers plugged in. And it explains the various options and the fact that there is a reduction in the participant's benefit to pay for the survivor annuity. But since he represented that he was not married, they didn't plug in those numbers in this example. So, again, the best estimate I can give you is if the people are roughly the same age, it would be something like a 20% reduction. And then you can also elect a higher survivor benefit, which, of course, creates a greater reduction in the participant's benefit to pay for that. What do you mean? Determine present value of the stream of income, half of it. You just total it all up and take 20% off? Yes, that's exactly how it's done, Your Honor. The present value? What's actually done is you take the value of the stream of benefits that the participant would get as a single person and you create a lump sum of present value of that stream of benefits. Yeah. Then you say, okay, given that lump sum present value, how much do we have to reduce the life annuity to provide for a 50% survivor benefit? So you knock off another 20%. Yes. And so that's what I meant by the term actuary. Survivorship, I guess, aren't we? I mean, the order just gives her 50% of the income stream. Yes, but, you know, there's an interesting aspect to this, and that is in this particular plan, and it's described, again, in the application at page 104 of the excerpts, there is a potential survivor benefit here because even if I'm single. It could be worked out that way. Well, but he designated his sons as the beneficiary of that residual contingent benefit. And so there is, even in this case, there is a potential conflict. But none of that's different from what you would do with a marriage. Your real issue is whether this can possibly be marital property. That's the bottom line issue, Your Honor, and we're just saying to the extent that there's any ambiguity about that term, you need to look at the statutory concept, the portion of the statute in which the language appears, as opposed to state law concepts. Well, I just thought about that, you know, looking at this case. Thank you, Your Honors. Thank you. Good morning, Your Honors. May it please the Court, my name is Harry M. Reichenberg. I represent the LE, Ms. Owens, who is present in court back there. The two major issues that are presented by the trust are the marital property rights and the issue of dependency. Before I address those, I'd like to make a couple of comments beforehand, opening statement, if you will. Last year, I attended a seminar here in Seattle sponsored by the Ninth Circuit entitled Nuts and Bolts for Ninth Circuit Practitioner. It was presented by Ms. Katterson. I believe you know her. In the material that was presented, there was something called an article, The Seven Sins of Appellate Brief Writing and Other Transgressions. And what really impressed me was a quote in there, The persuasive advocate presents a temperate, reasoned argument and adopts a friend-of-the-court approach. And that's the role that I'm trying to do here, Your Honor, not only as a friend-of-the-court, but also as a friend-of-the-trust. Who wrote that article? Who wrote that article? I believe it was Your Honor who wrote that article, Your Honor. I don't remember. Oh. According to the material, the author is Harry Ferguson. If you will be a real friend, at least to this member of the court, you'll discuss the Federal Defense of Marriage Act, which we may abbreviate to DOMA. And I want to read that act to you so you'll have it well in mind. I had it right here. Here it is. If you wish, I can come up with it. No. People only quote a part of it in their briefs. In determining the meaning of any act of Congress or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word marriage means only a legal union between one man and one woman as husband and wife. And the word spouse refers only to a person of the opposite sex who is a husband or wife. Now, just to be up front with my understanding of that, I know it originally originated out of concern about gay marriage. But it applies to any act. And I don't believe you can brush it off and say it didn't use the word marital. It uses wife, it uses spouse. How do you know what is marital unless you look at what is marriage? And once you apply that, I'm afraid your client just doesn't qualify. She's thrown out by DOMA. But tell me why not? Well, Your Honor, so far as the DOMA is concerned, it is there to state to all states, really, hey, you may recognize the effect of a marriage that is not between a man and a woman, one man, one woman. And some people, in fact, I can't think of his name right now, they feel that this is a violation of the full fair and I can't think of the act. But anyway, where one state, what they're saying is one state does not have to recognize that the marriage, what they would consider is not between one man and one woman. And therefore they can refuse all kinds of benefits. The key word for our case is legal union. It's a legal union between one man and one woman. And we don't have a legal union here. That's correct, Your Honor. We don't have. DOMA throws you out of court. I'm sorry? DOMA throws you out of court. I would not say that, Your Honor, because when we're talking about the, excuse me, when we're talking about the effects of the laws of statutes, we take a look at the law of 2063. And if I may, there are requirements under that which state that, and this is plain language. When we're talking about a quadro, we're talking about a domestic relations order that recognizes an alternate payee, that meets the requirements of subparagraph C and D, that is any order which relates to marital property rights, said relates to the rights of a dependent. And it's made per state domestic relations law. So here we have the statute that definitely, in clear language, points out what is required under ERISA. All right. But as far as the word marital goes, how can you know what marital is unless you know what marriage is? Well, the Federal definition of marriage. And that's it. Now, if you want to argue dependent, that's another issue. But I agree, Your Honor. But how about marital? How do you get around that? Well, so far as D-3 is concerned, and that's just a shortcut for the whole statute. But so far as D-3 is concerned, it doesn't say just marital property. It doesn't say marriage. It talks about relates to marital property. Marital property. Marital property rights. What is marital property except property relating to marriage? Well, as the Court just recently said, it doesn't really define it. I say it does define it. It defines marriage. And adjectives usually follow their nouns. That's a matter of English grammar. Well, the Excuse me. The noun here is the rights. And it relates to the rights. And when we talk, and the adjective would be the marital property. But we were trying to understand what marital is. And that's the adjective. And it relates to marriage. It really has not been defined. The worst thing that I could say about it is that we have a conflict here. That between if you're saying that the DOMA equates marital to marriage and the It doesn't equate it. It defines marriage. And then normal rules of English define the adjective in terms of the noun. The noun is marriage. The adjective is marital. In D3, the noun seems to be rights the way I understand it. What's that? In D3, the noun seems to be rights. But that doesn't focus on the marital. You don't have a right to property. You have a right to marital property. According to D3, it relates to the rights. To marital property. That's correct, Your Honor. Well, I think we've explored that. Tell me how dependent comes in. Dependent? Well, dependent comes in two ways. Number one, so far as the IRS is concerned, they have, again, a list, I believe, five requirements that in order to be considered a dependent. Is she a dependent now? No, Your Honor. They've been separated now for several years. She's an ex-dependent, isn't she? She's an ex-dependent now. But at the time, she was. The statute tells you you can give it to a spouse, a former spouse, a child, or a dependent. It doesn't say an ex-dependent. The dependent was at the time that the action took place, Your Honor. What do you mean the action took place? The fact that. . . The time that this case took place? No, she was an ex-dependent. I'm sorry, Your Honor. She was an ex-dependent when she brought this suit. That's correct, Your Honor. She was an ex-dependent. She was not dependent on him. If you construe the statute in accordance with the way people usually construe statutes, you've got spouse. And then they thought of, well, somebody might stop being a spouse or a former spouse. And you could have thought of a dependent and then a former dependent. But this seems to say if you lived in the house once and got room and board as an aunt or something, you'd go on the rest of your life being a dependent. She's not a dependent. She was a dependent, but she's not anymore. She was a dependent. That's correct, Your Honor. She's not a dependent at this time. She was a dependent. And this is the reason for the having brought this issue to the Court, because, here again, we're talking about the situation, as you well know, as you mentioned before, about being together for 30 years. Sure, it's tough. There's a great equity argument in her favor. We're not trying to talk about equity here, Your Honor. We're trying to talk about the law. And what about the equity? Who will be taxed on this pension? Who will be taxed? If you win, who will pay the tax? I am not familiar with that. Whatever the IRS rules would stipulate. Well, won't he have to pay all the tax? I am not sure, Your Honor. I think this was an argument that may have been made. I think he has to pay the tax if she gets a check, you know, every month. But if it's divided, the present value, then he doesn't have to. He doesn't pay the tax. I believe this was an argument made by the trust. So far as payment is concerned, any kind of a quadro that is issued to a person is, to my knowledge, income. I'm not even sure whether it's even taxed. Oh, no, I take that back. It's a pension. I looked it up. He pays the tax. Yeah, okay, Your Honor. He pays the tax. But the way they handle these things is that she gets entitled to receive the present value of that interest, which is you can factor in a lot of things. And if she's going to get tax-free, then you can probably factor that in, too. But that's not the issue before us. But she's considered to be a quasi- I mean, her relationship was considered by the state to be a quasi-marital relationship. That's correct, Your Honor. The state recognized that. That's correct, Your Honor. So it's legal.  And the essence of marriage is a contract. Basically, yes. So express or imply. What I was planning on presenting to the Court is that I view this, as I said before, not only as a friend of the Court, but also as a friend of the trust. And I know I was told that the trust operates in other states than Washington. And I know that the Court looks for conformity. We'd like to have conformity among the states. And so if I may analogize this case to taking a road trip on a toll road. And if this was not a pension under EVISA, we wouldn't even be here. But since it is, as I stated before, under EVISA, which is clear statutory law, it requires a correct answer. Now, when you go to the toll roads, normally you pay money to proceed. Here, it's a matter of answering questions. And so far as the first toll road would be ERISA toll booth. And there they have these questions. Does this fall under ERISA? And the ERISA statute is clear. Yes, it does. Those requirements that I mentioned before, those are all answered positively. And so we go on past that toll booth, and we go on to the next one. When we're talking of marital property rights, and as the Court stated before when asking Mr. McKenzie about whether there's any definition in the courts, in the government, about marital property, and the answer was no. So one of the requirements is, and the Court, the government for that matter, in domestic relations, has always stated that we will defer so far as domestic relations issues to the state. And the state in Washington has made a decision about relating to marital property rights. And this is under Connell v. Francisco. And this is where they established the legitimacy of quasi-marital relationships and the division of property. The only thing is they limited marital property to what was acquired during the relationship and not what was acquired either before or after. And so here we have a definition of this relation related to marital property rights because then we go to the courts, to the state courts, for that definition. So that would be the second toll booth that we go through. And the last toll booth would be about dependency. Now, in dependency, again, as I mentioned before, it deals with the IRS requirements for dependency. There really was no. I'm sorry? The state court didn't get into dependency. That's right because it's not a requirement for the state court. But it may turn out to have to be if you win because there's going to have to be some spouses probably aren't dependents and some are. I mean some people who have a long-term relationship may not be dependents. That's correct, Your Honor. So the trust is going to want to know whether they're dependents or not because they can only pay either spouses, which wouldn't qualify, or dependents, and maybe it would, but they're going to have to. How do they know who's a dependent if the state court doesn't rule on it? Well, the thing is this, Your Honor. It would have to be decided by the IRS rules. Now, also. Who decides? The IRS rules decide the requirements that they have for dependency. Well, how does the trust know when it gets an application for a portion of somebody's pension? Well, if I may, Your Honor. That person's a dependent or not. So far as this case is concerned, one of the requirements of their pension trust is if we deny your claim, the appellant's claim, then, if I may read from this, the notice of denial will set forth the following in a manner calculated to be understood by the applicant. One, the specific reasons for the denial. Two, specific reference to the Pertinent Plan provision. Three, a description of any additional material or information necessary. They never did that when the claim was. I understand in this case. Yes, in this case. The court said there's no real dispute that she was a dependent. She had no real income or anything. That's correct. And I think that may make the point for this case. But I guess what I'm saying is that I would think just as the trust wants an order that specifies some form of eligibility, saying, okay, maybe this does qualify as marital property if you win your argument, then they'd also want to know, well, does the applicant qualify as a dependent? But I guess you're saying that determination has to be made individually each time. It would have to be. I don't think you can make a blanket statement. I suppose it would be, is that person a dependent at the time of the state court order? I suppose that's the time. Who handled the division? They owned a house, right? They owned a house, Your Honor. Together. I'm sorry? Together. Together. That's correct. And then they got money, and they used the money to pay off debt. The house was sold. I don't know if there was any equity in the house, Your Honor. In fact, I would say that there probably was not. I think it went to pay off the debts of the community. Well, there's equity in the house. There was. I don't think there was sufficient equity to offset the debts. That's different. This is why we're here, Your Honor, because the only asset is the pension plan. That's different. But did they have any kind of an agreement for the division of property, or was it just on piecemeal? There is no agreement, Your Honor. The house was sold, and whatever equity there was went to pay off the debts. There was no money distributed to the people. Did she waive alimony or palimony? Did she waive? No, Your Honor. So she still couldn't get that. Is that what you're saying? There is no issue that I know of about this palimony. This is the reason why we filed the complaint for a quadro, because under the laws of the state of Washington, this would be considered acceptable. Now, her marriage was never dissolved? I'm sorry. Oh, to the best of my knowledge, the answer is no. Yeah, but isn't there a statute where you have a defunct marriage where the parties have not had any contact with each other for, like, 10 years? There is, but have they gone through that? Have they applied that statute? I don't think that statute. I'm not familiar with the statute. But if it is, it's never been brought up by the other party. There may be some process. There's a defunct statute. I've heard of cases that refer to that. There is a statute, believe me. But we've got nothing in the record on it. Not nothing, but we're... All we know is she was married and never dissolved. You know, I mean, I'm just curious. Are there any statistics on the number of quasi-marital couples living in the state of Washington? Statistics, can't come up with any specific number, but apparently based on the cases that I've read, I'm guessing it probably would be on the rise. Now, you have to remember, too, one thing, that when we talk about quadro, so far as the state is concerned, the state, if you don't recognize a quasi-marital relationship, then you just stop right there. So the next step as far as the state is concerned is we have certain standards that you have to meet. And so far as Washington is concerned, those standards were met, and this is why the quadro was issued. Okay. Your time is up. Yes, Your Honor. Thank you very much. Thank you, Your Honor. Let me ask you, I'm just curious. Counsel was... I'm just curious about something. Have you had one of these quadros come up before? Part of our practice is reviewing quadros, and it's a volume business in our practice. It's a volume business? Yes, Your Honor. Yes, Your Honor. Quadros? Yes. Lots of quadros, but they... All right. It just seems to me if two people have been together, and they've got a quadro, then the time to do the negotiating is right at the start. And, you know, you look at the house, and you look at the ERISA benefits, and you say, well, all that money that you put in, that's all... You know, community property is treated as community property. So I want my half back. And then you negotiate over that in connection with all the other things that you're working on. That is very often the scenario, Your Honor, and sometimes it is I'll take the house and you keep your pension. Oh, yeah. But we do have... Part of what we do is we provide model quadros because all the plans are different, and this is 24 years after enactment, and we still, I would say, reject at least 30% of the proposed quadros that are presented to us for various reasons. And so we wish it were a simple process. So where do you get this model quadro? Well, we actually prepare them for the benefit of the family law practitioners. We found that it's easier for us to provide them with a sample rather than for us to deal with their prototype because in the Seattle area, for example, the assumption seems to be that all plans are like the Boeing plan. Well, all plans are not like the Boeing plan, so that's why we get involved in doing this. So what does Boeing do? I think they have their own model. People are familiar with that, but not necessarily with some of the union plans. In any event, the one clarification I wanted to make because when counsel was addressing the issue of how do we determine dependency, he was quoting some procedural requirements for plans. Those procedural requirements are part of the Department of Labor claim regulation, which, as I mentioned earlier, is expressly not applicable to quadro resolutions. So the quadro that was used here was not part of your form, huh? Oh, no. No, it wasn't, Your Honor. We were unaware that the case was even in progress until after the fact. Okay. Well, that's interesting. All right. Thanks very much. Thank you, Your Honor. Judge Briggison, I'd like to say something. Go ahead. You can sit down. I just wanted to pitch. I'd like you both to consider what you're risking in going ahead in seeking a decision. You have a decision in the district court right now, which puts you in a reasonably good place. But you've got a person who was married to someone else. The relationship has never dissolved. You've got the Federal Defense of Marriage Act requiring a legal union to the person she's going to get the arrestor from. Those are substantial legal obstacles. In your favor, you've got a good, equitable case that appeals to anybody. It's a nice, equitable case. Now, what will happen in this court, it's quite likely that the district court will be affirmed. It's then quite likely there will be an on-bank court. It's conceivable, though that's often just a wild guess, that it could go to the Supreme Court of the United States. But whatever happens, it will be a long process before your client gets her hands on any money. Now, you, of course, want to have things go according to plan and don't want to have a lot of sloppy things hang out. But you're going to lose on the equities. And that might be true all the way through. Who can tell? Because most people that look at this say, oh, she was really like a wife. She deserved it. So the law is with you. The equity is with him. What do you do? Well, it's up to you. But it's going to be a long, bumpy ride if you don't do something yourselves. Well, in that vein, have you taken advantage of our arbitration program in the court, in our court? Have you done that? Your Honor, we did go to a mediation that was required by the schedule. Well, but we have our own process. We did. We were contacted by the mediator. And we did have a telephone conference. Frankly, we felt that we needed direction on this kind of an issue because it's going to arise in another case. And we didn't feel, from the standpoint of the trust, that there was a way, basically, to sort it out. Oh, I see. So you've talked to the mediator, but you want to make a test case out of this. We prefer not to be in this position. You don't care whether you win or lose as long as you get the law. You really thought seriously, you're going to lose, but you still want the law clearly defined. Well, I think, you know, obviously we don't want to lose, but we need some direction so we can know how to handle the next case. In your equation, getting direction is more valuable than, it offsets the pain of losing. I guess that's one way to put it, Your Honor. Sounds like the stock market. All right. Thank you very much. Thank you, Your Honor. Thank you. Now we go to Nevis v. Great American Capital.
judges: Pregerson, Canby, Noonan